IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Roslyn Hale,

        Plaintiff,

        v.                                Case No.: 1:20-cv-00503 SAG

Mayor and City Council of
Baltimore City, et al.,

        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANT FERNANDO MOORE, JR.

Defendant Fernando Moore, Jr., by his undersigned counsel, hereby moves for summary judgment on the Complaint of Plaintiff Roslyn Hale, specifically on the two counts brought against him, Counts III and V. There is no genuine issue as to any material fact and Mr. Moore is entitled to judgment as a matter of law.

### Background Facts

Ms. Hale and Mr. Moore worked together for Baltimore City government for approximately four and a half years. They initially worked together starting in October 2013 in a grant-funded program called the Community Action Partnership in the Mayor's Office of Human Services. Ms. Hale's appointment ended in June 2017, while Mr. Moore continued employment in a permanent position to which he had been promoted in February 2017.

Ms. Hale and Mr. Moore struck up a friendship at work and also enjoyed a good social relationship outside of work. They went on "double-dates" with their significant others, Ms. Hale's then-husband and Mr. Moore's then-fiance'/now wife. Deposition of Roslyn Hale (7/2/21) p. 45/1-12. Ms. Hale confided in Mr. Moore about her numerous personal challenges

and introduced him to her children. Hale Dep. p. 50/11-51/15. Ms. Hale appreciated that her young son and Mr. Moore struck up a "very close" relationship. Hale Dep. p.248/18-21. Ms. Hale viewed Mr. Moore as "a younger brother." Hale Dep. p. 42/3-6. (She is 7 years his senior.) Ms. Hale and Mr. Moore enjoyed listening to the same musicians, such as Drake and Usher, Hale Dep. p. 270/15-271/2, and Mr. Moore, an emerging professional musician and producer himself, shared his original music with Ms. Hale. He considered her one of his collaborators from whom he could seek valuable feedback on new material, and on a number of occasions Ms. Hale listened to his new songs and provided positive feedback. Hale Dep. p. 52/15-54/20, p. 269/14-273/13; Hale Dep. Ex. 13.

When Ms. Hale's first stint of employment ended in 2017, she enlisted Mr. Moore's help with her application process to return to the City in a permanent position. Hale Dep. p. 268/20-269/13. Ms. Hale also requested Mr. Moore's assistance in getting her assigned to his site, the Northern Community Action Center. Hale Dep. p. 58/8-20. Ms. Hale was hired back to the City starting on August 14, 2017 and was assigned to Mr. Moore's site. Mr. Moore had been promoted again in the interim, so he served in a supervisory role upon her return.

The two worked well together. Hale Dep. p. 41/20-42/6. Then in late May of 2018, Ms. Hale complained to her union that Mr. Moore had behaved improperly back in the fall of 2017. When human resources learned of the complaint and contacted Ms. Hale to conduct an investigation, she declined to participate. Ms. Hale was transferred to a different site which the City says was at Ms. Hale's request, a fact Ms. Hale contests. While declining to cooperate with the internal investigation, Ms. Hale filed an EEOC Charge on June 8, 2018, Hale Dep. p. 183/4-185/11; Hale Dep. Ex. 11, which was investigated and dismissed with a no cause finding in December 2019. Hale Dep. p. 295/9-296/14; Hale Dep. Ex 16.

Despite the lack of cooperation by Ms. Hale, human resources carried on its investigation while placing Mr. Moore on suspension pending the outcome. Mr. Moore cooperated fully. He ultimately was suspended for two weeks without pay for "conduct unbecoming" his role in his use of his work phone for personal communications with Ms. Hale, and was required to transfer to a new location. Deposition of Fernando Moore Jr. (6/21/21) p. 57/4-58/17. Ms. Hale then returned to the Northern Community Action Center. Hale Dep. p. 170/2-13. Ms. Hale continued to work in that role until July 5, 2019, when she voluntarily resigned to start a new job at the Baltimore City Housing Authority, Hale Dep. p. 165/10-14; p. 297/1-7, where she worked two years before resigning. Hale Dep. p. 182/9-14. Mr. Moore continued his employment with the City until March 2020, when he voluntarily resigned to accept a position as a Deputy Administrator with the Baltimore County Department of Social Services, where he remains employed in a higher level position following a promotion.

FACTS NOT GENUINELY IN DISPUTE

A.    Count III – Md. Declaration of Rights Equal Protection

In her February 25, 2020 Complaint, Ms. Hale alleged that "beginning in October, 2017 and continuing until Plaintiff was reassigned on or about May 31, 2018, Defendant Moore continually sexually harassed Plaintiff. Throughout the eight months of harassment, Defendant Moore constantly made repeated inappropriate and lewd comments and sexual advances, both in person at the office and over text from Defendant Moore's work phone issued by Defendant MOHS." Complaint, par. 11. In the Complaint, Ms. Hale also alleged specifically that there were text messages sent by Mr. Moore from his work phone stating "he misses me" and "wants me," Complaint par. 13, and that he made a comment "what would you do if I came up behind you and put my hands on your hips?'' Complaint par. 14. Ms. Hale also included in her Complaint

the allegation that Mr. Moore emailed her a lewd song on October 14, 2017 and that he said he wrote it for her. Complaint par. 16.

In her January 2021 Answers to Interrogatories, Ms. Hale swore that Mr. Moore "on several occasions, made inappropriate comments to Mrs. Hale about her physical appearance and concerning sexually suggestive topics. He also created and produced a sexually suggestive rap song for Mrs. Hale." MSJ Exh. 1, Answer 1. She also claimed, "Mr. Moore made unwanted sexual advances towards Mrs. Hale and didn't stop after she told him that she wasn't interested in him in that manner." MSJ Exh.1, Answer 7. She also swore to this account: "Mr. Moore constantly made inappropriate comments towards Mrs. Hale in reference to her body and his sexual attraction to her. Mrs. Hale told him more than once that his comments made her uncomfortable yet he continued to communicate his attraction to her. Mr. Moore often expressed his desire to grab Mrs. Hale's hips from behind, expressed that he was aroused by her, and constantly made comments about the fit of her clothes." MSJ Exh. 1, Answer 8.

But then in her July 2, 2021deposition, Ms. Hale testified that her sexual harassment claim was based on only a few incidents that transpired close in time to each other in the fall of 2017. Hale Dep. p. 209/1-210/14. She testified she is not sure of the exact sequence or the specific dates of the incidents. As for the particulars of the alleged sexual harassment, Ms. Hale testified:

1. There were "maybe 5 or 6 texts." Hale Dep. p. 18/3-19/7;

2. One text was "I miss you" Hale Dep. p. 20/17-21/4, although it "wasn't as sexual." Hale Dep. p. 85/9-18;

3. One text was "listen to this song. I wrote this song for you." Hale Dep. p. 20/17-21/4;

4. Mr. Moore once asked, "what would you do if I put my hands, came up behind you and put my hands on your hips," to which Ms. Hale responded, "I would slap you." Hale Dep. p. 27/5-28/6. Ms. Hale testified that occurred by the office copier where everyone heard it, and a debate ensued among the group of them; and

5. Mr. Moore said "you look nice" when Ms. Hale wore a dress or heels to work. Hale Dep. p. 113/1-12.

Ms. Hale testified that those events were "all about the same time," in September or October 2017. Hale Dep. p.89/10-90/7. Ms. Hale reiterated, "it was all in that same time span," Hale Dep. p. 113/13-15, 210/4-14, and that the events happened only one time. Hale Dep. p. 111/9-112/16. Ms. Hale said that she did not recall the specific number of text messages but that "those are the major ones that stick out to me." Hale Dep. p. 30/18-31/1.

Of note, Ms. Hale added on a new more graphic allegation in her deposition which had not been included in her Complaint or answers to interrogatories or EEOC Charge – she testified that Mr. Moore had propositioned her for sex in exchange for money. She claimed that in September or October 2017, he texted "how much do I have to pay to get you," Hale Dep. p. 20/17-20.

Ms. Hale testified that there were no prior incidents she considered inappropriate or sexually harassing. Hale Dep. p. 51/16-52/3. Ms. Hale testified the incidents left her "insulted and hurt." Hale Dep. p. 85/19-86/3. She elaborated on her reaction: "I was hoping that he was just going through some crazy trying to get his last hurrahs [prior to his imminent wedding], just did a misstep and would have stopped and apologized. So if there was any continuation, it was still me hoping he was still who I perceived to be a good person and someone I perceived to be like a younger brother who just made a mistake." Hale Dep. p. 98/12-99/1, p. 96/1-19.

In follow up questioning, Ms. Hale testified that that hope came to fruition.

Q. Now, you testified that when Mr. Moore, I think you called it his last hurrah in the fall of 2017. You were hoping he would just come to his senses and stop. Do you remember that testimony?
A. Correct.
Q. Well, he did stop it, didn't he?
[Objection]
A. He stopped the sexual harassment but continued the antagonistic behavior.

Hale Dep. p. 226/9-18.

Ms. Hale also referred to Mr. Moore's subsequent conduct as being "passive aggressive."

She testified at some length as to what she meant by that term, and she summed it up as this:

Q. You're talking about the leave time, that's the passive aggressive behavior around leave time; is that what you mean?
A. About leave requests, about roles and responsibilities, yes.

Hale Dep. p. 279/11-15; see also Hale Dep. p. 220/2-224/12.[1]

In the fall of 2017, "after he stopped the sexual harassment," Hale Dep. p. 226/15-18, Ms.

Hale did not complain or take sick leave or see a therapist, and the documentary evidence of her

interactions and communications with Mr. Moore in that timeframe demonstrate her customary

comfort and friendliness with Mr. Moore. For example, just four days after the song was shared,

Ms. Hale sent Mr. Moore a personal and very cheerful birthday message on October 18:

Haaaappy birthday! [celebratory emojis] hopefully ur too drunk to read this [emoji].". Hale Dep

p. 242/5-243/3, Hale Dep. Exh. 12. At the time, Mr. Moore was on leave for his October 21

wedding. Hale Dep p. 242/14-19. After Mr. Moore's return from his honeymoon, she and Mr.

Moore continued working effectively together to perform their job duties. Hale Dep p. 264/9-

267/6, Hale Dep. Exh. 12. On November 16, 2017, Ms. Hale volunteered to assist Mr. Moore

---

[1] The retaliation claims are not brought against Mr. Moore so they are not addressed in detail herein. However, Mr. Moore adopts the argument of defendant Baltimore City with regard to those, particularly as that relates to Ms. Hale's behavior and motivation close in time to her report to her union.

with a Thanksgiving project he was planning for the community, Moore Dep. p.208/17-209/21, then posted photos online of them at the event. Hale Dep Ex. 12 (Mr. Moore: "Thanks again for your awesome work today." Ms. Hale: "NP. I posted one of the pix." 11/16/17). She also carried on her same familiar and sometimes playful banter in her texts to Mr. Moore on his work phone, Hale Dep Ex. 12 (Ms. Hale:"[emoji] dumbass," 10/18/17; Ms. Hale: "Sorry…Jeff (husband) son school called., his ass got into a fight," 10/25/17; Ms. Hale: "[emoji] fuck..k," 11/16/17; Ms. Hale: "Got pulled over by the police thank the lord I threw on a little make up for work today got me out of a $500 ticket." 12/13/17). She also continued to enjoy her son's friendship with Mr. Moore, as evidenced by his texting and playing games with Mr. Moore from her phone to Mr. Moore's work phone. Hale Dep p.246/16-247/19, Hale Dep. Ex. 12.

As for the actual text messages central to her allegations, Ms. Hale testified initially that she did have them, but she did not "have them on hand", then stated that they were being "held by T-Mobile company." Hale Dep. p. 19/2-18. When questioned further about the missing text messages, Ms. Hale testified, "these incidents happened years ago. My phone only keeps messages I believe six months to a year." Hale Dep. p. 20/1-11. Then later in her deposition, Ms. Hale testified that she had deleted the alleged proposition text message "probably within an hour of receiving it." Hale Dep. p. 87/13-88/9. She also testified that prior to deleting it, she took a screenshot and sent that to a co-worker, Hale Dep. p.83/5-12, but when asked about the whereabouts of that screenshot image, she testified she had deleted that too. Hale Dep. p. 83/5-12, 197/18-198/6. To date, Ms. Hale has produced no text messages, or any documentary or electronic evidence relating to or probative of her sexual harassment allegations. The sole document pertaining to her cell phone account, which was eventually produced after her deposition and days prior to the end of discovery, was the cell provider's list of basic phone call

data in the form of a very lengthy call log (incoming/outgoing/duration) associated with her cell number. It was devoid of any text information or substantive content.[2]

Mr. Moore produced a complete download of all of his work phone text messages with Ms. Hale for the entire period of Ms. Hale's second stint working with Mr. Moore at the City, 272 messages in total. Moore Dep. p. 51/2-52/10; Hale Dep. Ex. 12. Contrary to Ms. Hale's claims, there were no such offensive messages that were at the heart of her Complaint and EEOC Charge. There were no messages from Mr. Moore that were even vaguely inappropriate or off-color. Hale Dep. Ex. 12. The messages show cordial and professional communication between Mr. Moore and Ms. Hale, with the exception of an occasional off-color, inappropriate or intemperate remark *by Ms. Hale*, some of which are recounted above. Mr. Moore was unable to download or produce his personal phone text messages for the period at issue because his phone in use during that period had broken and been lost or disposed of well before this suit was filed. Mr. Moore testified that when the matter was being investigated in the summer of 2018, he still had possession of the broken phone, Moore Dep. p. 50/15-51/1, but because it could not even download messages by that time, he took some photos of the texts that were relevant to the investigation by using his replacement phone, and he then produced those photos to the City in connection with the investigation. Moore Dep. p. 53/18-54/15. He testified that he last saw the broken phone in an old storage bin and that he had not seen it since he moved in November 2018 and had no idea where it was. Moore Dep. p. 203/6-204/11, 220/17-221/4. Mr. Moore testified in his deposition that there never were any such inappropriate text messages. Moore Dep. p. 135/12-17.

---

[2] The complete call log consists of 729 pages and shows data for 25,281 calls. It is not probative in full form. As such, it is not attached hereto as an exhibit but will be provided upon request.

With regard to the song at issue, during the 2018 workplace investigation and in discovery Mr. Moore produced the email he sent Ms. Hale on October 14, 2017 attaching the song. Mr. Moore's email subject line is one word: "Listen," and there is no content in the body of his message. Hale Dep. Ex. 13, p. 5. Mr. Moore told the City during the investigation and also testified in his deposition that he did not write the October 2017 song for Ms. Hale and had never said such a thing. Moore Dep. p. 65/21-66/2, 145/14-19. He testified and produced documentary evidence that he had shared songs with Ms. Hale a number of times over the years, that she was a supporter and fan of his work. Mr. Moore testified: "You know, Ms. Hale and I have been collaborators. I value her opinion of my music. She's always enjoyed it and even this song, she said she enjoyed it." Moore Dep. p. 74/18-75/7.

Mr. Moore produced the proof that he had previously emailed her songs on April 8, 2014, May 13, 2016, and October 2, 2016. Hale Dep. Ex. 13. p. 1-4. Mr. Moore testified that all of those songs "are similar in nature," Moore Dep. p. 68/15-69/9, to the one she later complained about. While Mr. Moore and his brother, a church music minister and his partner in the business, "grew up on music in church" and were raised by a mother who is an opera singer, Moore Dep. p. 14/9-15/6, with their own music they strive to accomplish commercial success in the "R&B hip hop" genre, Moore Dep. p. 66/3-10, similar to Dre or Little Wayne. Moore Dep. p. 75/15-76/1. Mr. Moore knew Ms. Hale enjoyed the same music and they sometimes listened to that genre and such artists as Drake or Little Wayne when they rode together in a car. Moore Dep. p. 218/20-219/15. Mr. Moore explained it this way: "All the songs are created for entertainment. All the songs are specifically written with the goal in mind to hit billboard. My brother and I, we produce records with the goal of, you know, getting music on billboard and pop culture dictates kind of like the content of our records." Moore Dep. p. 69/1-7. "The whole goal is to make it

entertaining and to be competitive in the industry. My content has to be similar in nature to what's popular." Moore Dep. p. 72/19-73/1. Explaining further Mr. Moore testified: "It's a lyric in a song and the content is – matches popular music which is specifically meant to entertain." Moore Dep. p. 73/20-74/1.

Ms. Hale never asked him not to share his music with her or said that his music made her feel uncomfortable. Hale Dep. p. 54/17-55/3; Moore Dep. p. 81/8-13. To the contrary, she gave him positive feedback and wrote that Mr. Moore was "a talented dude," a viewpoint she touted in a Facebook post. Hale Dep. p. 270/19-271/4; Hale Dep. Ex. 1 (Ms. Hale: "one of the most talented dudes I know"). Mr. Moore testified that the October 2017 song "is similar to all the other songs that were shared. They all have the same content." Moore Dep. p. 69/20-70/1.

Ms. Hale confirmed that was her viewpoint – she testified that she liked all three songs Mr. Moore previously shared with her, that she had let him know that that was her opinion, and that she also thought his music videos were "great." Hale Dep. p. 267/7-272/9. When initially asked in her deposition about how she thought the October 2017 song differed from the previous ones, Ms. Hale testified: "it was different. Because he said he wrote the song about me and it was more explicit than any other song I've heard him write. . . [the other songs] had a sexual nature to them and undertones. But more importantly they weren't about me." Hale Dep. p. 94/14-95/4. She testified with specificity about what she did in response:

Q. What did you tell Mr. Moore in response to listening to She Fun on or about [October 17, 2017]?
A. I asked him if he was drunk because he said he wrote the song about me.
Q. Where is the message that he wrote the song about you?
A. We were speaking verbally over the phone and he sent me that via e-mail, I believe, and then he had texted me originally, and that's why I called him and asked him if he was drunk because of the words from the song and the conversation that took place in the office, the words were very similar to what he said in the office.

Hale Dep. p. 274/6-20.

Ms. Hale testified about more details of that call:

Q. And what did he say?
A. I believe he said he wasn't drunk.
Q. Okay. Anything else?
A. I don't think the conversation lasted much longer than that. I basically said you're crazy. I tried to kind of half joke it off like he must be drunk. And ended the call.
Hale Dep. p. 276/5-14.

Notably, the cell service carrier's detailed call log produced by Ms. Hale reveals that there was no such call. See MSJ Ex. 2, the 9 pages of activity for the month of October 2017 excised from the 279-page call log. It reveals that there was no call from Ms. Hale to Mr. Moore on October 14, 2017 or anywhere around that date. In fact, that month there was only one call between the two, and it was placed by Mr. Moore from his work phone to Ms. Hale during the workday of October 25, 2017, his first day back at work after his honeymoon.

When asked about her quick recovery within just four days evidenced by her sending Mr. Moore the October 18 cheerful birthday text, Ms. Hale testified differently about her reaction to song: "my upset was not necessarily about the lyrics. . . . the song itself was not as jarring as the content behind it and his continued passive aggressive behavior that continued afterwards." Hale Dep. p. 277/3-279/10.

Then over six months later, Ms. Hale decided to complain to the union. As for the time gap and her motivation, Ms. Hale testified:

Q. So what is it that caused you in May 2018 to report it?
A. Because as I has stated, he had created such a hostile work environment when he allowed Mr. Dotson to verbally assault the elderly admin and his comment was these bitches are getting on my nerves, I knew that someone needed to know what was going on in the office.
Q. You testified earlier that, quote, that was my tipping point. Is that what you mean by that?
A. That was my last straw, yes.

Hale Dep. p. 227/16-228/6.

With Ms. Hale transferred and Mr. Moore under investigation and suspended, their work together came to an end.

## B. Count V - Intentional Infliction of Emotional Distress Claim

In her Complaint, Ms. Hale alleged that "despite Plaintiff rejecting Defendant Moore's advances multiple times, Defendant Moore intentionally and recklessly continued to sexually harass Plaintiff knowing that his advances were unwelcome and inappropriate. Defendant Moore's conduct included, but was not limited to, continuous sexual advances, a sexually explicit song detailing how he wanted to perform oral sex and other sexual acts on Plaintiff, and threats of battering Plaintiff by putting his hands on her hips despite Plaintiff clearly telling Defendant Moore his actions were unwelcomed." Par. 97 & 98.

In her Answers to Interrogatories, regarding the facts upon which she based her intentional infliction of emotional distress claim, Ms. Hale swore that Mr. Moore "intended to express his sexual attraction to Mrs. Hale. Even after Mrs. Hale told him that his comments were unwanted, inappropriate and made her uncomfortable, he continued to text her from his work and personal phones, and continued to ask her out on dates or make comments about her body. He reasonably knew that his repeated sexual advances were likely to cause emotional distress. The song that Mr. Moore composed for and sent to Mrs. Hale was lewd and so far outside the bounds of professionalism and common decency that it must be considered extreme. Mrs. Hale made it very clear that she did not invite or accept Mr. Moore's sexual advances." MSJ Exh. 1 Answer 12.

When Ms. Hale was asked in her deposition the basis for her claim of intentional infliction of emotional distress against Mr. Moore, she testified:

Q.  Then the last person that you said caused you emotional distress is Mr. Moore.  Tell me what he did or said to cause or contribute to your emotional distress.

A.  Just putting me in this position.

Q.  You're going to have to explain what you're saying to me.

A.  I'm trying to.  Saying the things that he said to me and expecting me to just accept it and continue just with the passive aggressive attacks after the sexual harassment ended knowing that I really feel that we had a genuine relationship.  As you asked me, we discussed personal information.  We discussed things about our childhood.  I really looked at him like a younger brother.  And instead of him apologizing after his misstep, he continued with the antagonizing and the passive aggressiveness that

caused me to feel like I had to protect myself and bring all of this forward.

Q.  Ms. Hale, you're going to have to tell me what were the passive aggressive attacks. You're going to have to identify.

A.  Things that I stated in my claim like denying my time and pretending like he had given me occurrences and, in situations where it was

common practice for me to assist a client, telling me no.  Just a misuse of his power to at any opportunity just to tell me no so that it felt like he was doing that to get back at me for telling him no.

Q.  Is there anything else that you allege Mr. Moore did to cause your emotional distress?

A.  Like I said, just putting me in this whole situation.  I finally had a job that I enjoyed working at.  The situation caused me so

much anxiety.  I've lost -- a place I looked at as family.  The whole situation has forced me to leave a place that I really enjoyed working at

and helping people and the bonds that I created there simply because he couldn't control his sexual urges and then his ego didn't allow him to

apologize.  And then he continued.  He continued to try to show me he was in control, knowing I've had to fight my whole life, like you said, I

don't have a problem speaking up and voicing my opinion because I've had to fight in a place where I didn't think I should have had to.

Hale Dep. p. 163/4-165/9.

        In discovery, Ms. Hale identified as a witness a social worker she saw for two sessions in July 2018, over nine months after the alleged sexual harassment episodes and six weeks after filing her EEOC Charge. Ms. Hale acknowledged that she had many ongoing personally stressful events in the timeframe at issue, including a child custody fight, Hale Dep. p. 191/4-193/9, but stated the stress was "no more than I've had throughout my whole life . . . My whole life has been stressful. So that period of time was no additional stress than I'm used to handling." Hale Dep. p. 193/10-21. She was not prescribed any medication, Hale Dep. p. 195/18-196/9, and she sought no additional therapy after the two July 2018 sessions. Hale Dep. p. 285/10-286/13.

<u>ARGUMENT</u>

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." . . . 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 252 (1986). The Fourth Circuit Court of Appeals has made clear that "conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion."

<u>Sedar v. Reston Town Center Property, LLC</u>, 988 F.3d 756, 761 (4th Cir. 2021).

Of particular significance here is this distinction drawn by the U.S. Supreme Court:

In Wilkerson, we stated that "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party. 336 U.S., at 57, 69 S.Ct. 413. But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should give credence, not the evidence that the court should review. . . . It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554–555, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); Liberty Lobby, Inc., supra, at 254, 106 S.Ct. 2505; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Liberty Lobby, supra, at 255, 106 S.Ct. 2505. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id., at 300.

<u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 150–51 (2000).

Viewing "the evidence to which the trial court should give credence," Ms. Hale cannot meet this test, and Mr. Moore should be granted judgment as a matter of law on Counts III & V.

<u>The Undisputed Facts do not Support a Claim<br>under the Md. Declaration of Rights Equal Protection Clause</u>

Ms. Hale brought a claim against Mr. Moore under the Maryland Declaration of Rights Articles 24 and 46, claiming that the alleged sexual harassment and communication of the October 17, 2017 song denied her equal protection of law.

Article 46 of The Maryland Declaration of Rights provides that "[e]quality of rights under the law shall not be abridged or denied because of sex." This constitutional provision is a restriction on governmental action, not private action.

> [U]nlike common law torts, which are designed generally to protect private persons from each other, Constitutional provisions have the more narrow focus of protecting citizens from certain unlawful acts committed by government officials. Indeed, only government agents can commit these kinds of Constitutional transgressions.

<u>DiPino v. Davis</u>, 354 Md. 18, 50-51 (1999), citing <u>Clea v. City of Baltimore</u>, 312 Md. 662, 684–85 (1988). Therefore, the Article 46 constitutional claim asserted against Mr. Moore fails as a matter of law.

With regard to the Article 24 equal protection claim, it is "regarded in Maryland courts as embodying the principle of equal protection as expressed in the Fourteenth Amendment to the federal constitution." <u>Knox v. Mayor & City Council Baltimore City</u>, No. CV JKB-17-1384, 2017 WL 5903709, at *8 (D. Md. Nov. 30, 2017); see also <u>Hawkins v. Leggett</u>, 955 F.Supp.2d 474, 496 (D. Md. 2013) (quoting <u>Rosa v. Bd. Of Ed. Of Charles Co</u>. 2012 WL 3715331 at *6 (D. Md. 2012)("'Article 24 of the Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States. In other words, [i]t has been clearly established that

Article 24 protects the same rights as the Fourteenth Amendment. Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment.'")

A federal equal protection claim analysis follows Title VII sexual harassment authority. Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994). In order to be actionable, sexual harassment must be so "severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment'." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). The Supreme Court further explained,

in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. 510 U.S., at 21-22, 114 S.Ct., at 370-371. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id., at 23, 114 S.Ct., at 371. Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale, 523 U.S., at 81, 118 S.Ct., at 1003. A recurring point in these opinions is that "simple teasing," id., at 82, 118 S.Ct., at 1003, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

Faragher v. City of Boca Raton, 524 U.S. at 787–88.

Under these principles, Ms. Hale's claim fails. Ms. Hale testified that her sexual harassment claim was based on "maybe 5 or 6 texts," one of which was "I miss you," and that Mr. Moore had said "you look nice" when she wore a dress or heels to work. Ms. Hale testified that Mr. Moore once asked a question about what she would do if he placed his hands on her hips, to which she replied she would slap him. And she testified that Mr. Moore once texted her to "listen to this song. I wrote this song for you." She also lodged a late-arriving claim that Mr.

Moore had texted an offer to pay her for sex. She testified that those events left her insulted and hurt.

As for any proof that would back up those allegations, there is none. Ms. Hale disposed of all of the text messages, and in the case of the alleged most serious text, she also deleted the screenshot she claimed she took and transmitted to a co-worker. And faced with that void of proof, she took no action to contact the person to whom she claimed to have sent that text and screenshot to retrieve a copy of the text and screenshot for proof in her lawsuit. Hale Dep. p. 204/16-20. Similarly, she testified that she believed her iPhone backed up her photos to a cloud application, Hale Dep. p. 207/4-6, but she did not retrieve and produce an image of the alleged screenshot from that back-up cloud source either.

Totally undermining her claim of being offended by the October 17, 2017 song, the testimony that she placed a phone call to confront Mr. Moore immediately upon receipt is proven false by the cell phone carrier log she herself produced. Likewise, her testimony that Mr. Moore texted her and stated he wrote the song for her is disproven by documentary evidence showing that Mr. Moore emailed transmitting the song, writing "Listen" and no more. As well, her sworn statements in her EEOC Charge, Complaint, and answers to interrogatories that Mr. Moore sent her offensive emails from his work phone also were disproven by documentary evidence as the download of the contents of Mr. Moore's work phone proves Mr. Moore engaged in no such conduct and in fact was the more professional of the two.

Ultimately, Ms. Hale adjusted her story when confronted with the documented history of her appreciation for that music genre and enthusiasm for Mr. Moore's music in particular: "my upset was not necessarily about the lyrics. . . . the song itself was not as jarring as the content behind it and his continued passive aggressive behavior that continued afterwards." Ms. Hale

also substantially adjusted her previous attestations that she was harassed "over eight months," that the offensive behavior was "constant," that Mr. Moore "often" made a comment about putting hands on her hips, and that he "didn't stop after she told him she wasn't interested," by way of her deposition testimony that it was a handful of incidents over a short period of time and each alleged incident happened once.

As for the record evidence of any impact on Ms. Hale's ability to work, while Ms. Hale alleged an extreme impact and many symptoms, the record shows no sign of that either. The documented record of her interactions with Mr. Moore demonstrates just the opposite, that she was cordial and friendly and playful with Mr. Moore and, as she agreed in her deposition, they continued working well together. That, coupled with the fact that she did not file a complaint, take time off from work or seek counseling, and her own admission that the stress in that timeframe was not any different than throughout her life, clearly contradicts her bald allegation of extreme distress. She continued to do her job working well with Mr. Moore until many months later when, becoming perturbed with a male co-worker's conduct towards an elderly female in the office, she complained to her union about "a hostile work environment . . . going on in the office."

Even if her markedly curtailed and unsubstantiated claims are credited, they do not constitute the requisite severe or pervasive conduct that would render a reasonable employee's working conditions hostile or intolerable. Indeed, the record evidence demonstrates that Ms. Hale herself did not consider her working conditions to be hostile or intolerable. Rather, she viewed the alleged episode as a "misstep" by a "good person" who "just made a mistake" and then stopped. And the record shows that but for her feelings about co-worker Mr. Dotson in May 2018, she may never would have complained at all.

Given that the Court is assessing "the evidence to which [it] should give credence," Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. at 151, we contend that even viewed in the light most favorable to her, Ms. Hale's claims cannot survive summary judgment. The profound inconsistencies and shifting in her own sworn accounts, the total absence of any corroborating evidence, and the straight up contradictions of her accounts by the available documentary evidence render her testimony alone insufficient to create a triable issue of fact. "The mere existence of a scintilla of evidence" in favor of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.

Given that Ms. Hale has failed to come forward with proof of sufficient facts to permit a reasonable jury to conclude that Mr. Moore violated her constitutional right to equal protection, judgment should be entered for Mr. Moore on Count III.

<u>The Undisputed Facts do not Support a Claim for Intentional Infliction of Emotional Distress</u>

Even accepting as true for purposes of the summary judgment analysis the particulars of Ms. Hale's allegations testified to in her deposition -- that there were "maybe 5 or 6 texts" that she found offensive; one text saying "I miss you"; one text to "listen to this song. I wrote this song for you"; one instance of asking, "what would you do if I put my hands, came up behind you and put my hands on your hip"; a comment "you look nice"; and one text "how much do I have to pay to get you" -- the record is clearly inadequate to meet the high bar for a viable intentional infliction of emotional distress claim. (Again, most or all claims are either unsupported by any proof or directly contradicted by the record evidence, and Mr. Moore has denied all of these allegations and produced evidence disproving the alleged incidents.)

The tort of intentional infliction of emotional distress requires proof of these elements:

(1) The conduct at issue was intentional or reckless; (2) the conduct was extreme and

outrageous; (3) there is causal connection between the extreme and outrageous conduct

and the resultant distress; and (4) the emotional distress is severe.

Harris v. Jones, 281 Md. 560, 566 (1977).

As the Maryland courts have made clear, the tort of intentional infliction of emotional

distress requires considerable and specific proof:

To sustain an allegation of IIED the alleged conduct must be both extreme and
outrageous. Batson v. Shiflett, 325 Md. 684, 734, 602 A.2d 1191 (1992) ("For conduct to meet
the test of 'outrageousness,' it must be 'so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized
community.' ").

*
*
*

Further, the alleged conduct must "go beyond all possible bounds of decency and is to be
regarded as atrocious and utterly intolerable in a civilized community." Lasater v. Guttmann, 194
Md. App. 431, 448, 5 A.3d 79 (2010).

*
*
*

[The plaintiff must prove] that the emotional distress that he experienced was so severe that "no
reasonable person could be expected to endure it."

Haines v. Vogel, 250 Md. App. 209, cert. denied, 475 Md. 681(2021).

As set out extensively above, Ms. Hale has not and cannot come forward with proof

sufficient to meet any of those essential prongs. As such, no reasonable jury could conclude that

Mr. Moore committed the tort of intentional infliction of emotional distress and judgment should

be entered in his favor as a matter of law on Count V.

CONCLUSION

Reviewing the record in its entirety, no reasonable jury could conclude that Mr. Moore

violated Ms. Hale's constitutional right to equal protection or intentionally inflicted emotional

distress upon her. Accordingly, judgment should be entered against Ms. Hale and for Mr. Moore, as a matter of law.

        \_\_/S/_____
Kathleen Cahill
The Law Offices of
      Kathleen Cahill, LLC
15 East Chesapeake Avenue
Towson, MD  21286
410-321-6171
kathleen@kathleencahill-law.com
**Attorney for Defendant Moore**